CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED
2015 OCT -9 PM 3: 25
DEPUTY CLERK _____

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| DAVID DEARMOND, <br> Institutional I.D. #21772-045, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br> *et al.*, <br><br> Defendants. | § § § § § § § § § § § § | <br><br><br><br><br> Civil Action No. 1:14-cv-123-BL <br><br><br><br><br> Assigned to U.S. Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff David Dearmond (Dearmond), proceeding *pro se* and *in forma pauperis*, filed his complaint on August 11, 2013, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),[1] and the Federal Tort Claims Act (FTCA).[2] (Doc. 1). On March 26, 2015, Dearmond testified at an evidentiary hearing before this court, pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). (*See* Docs. 13, 14). Dearmond has consented to proceed before a United States magistrate judge. (Doc. 8).

---

[1] "Under *Bivens* a person may sue a federal agent for money damages when the federal agent has allegedly violated that person's constitutional rights." *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 622 n.1 (5th Cir. 2006) (citation omitted).

[2] "The FTCA confers on federal courts exclusive jurisdiction of civil actions on claims against the United States for money damages for personal injury caused by the negligent or wrongful acts or omissions of any federal employee while acting within the scope of his office or employment. 28 U.S.C. § 1346(b)(1). FTCA claims may be brought against only the United States, and not the agencies or employees of the United States. *See* 28 U.S.C. §§ 2671, 2679." *Esquivel-Solis v. United States*, 472 F. App'x 338, 339 (5th Cir. 2012) (unpublished).

## I. Background

Dearmond lodges a multitude of allegations in his lengthy complaint, but the gist of his claims revolve around Defendants' deliberate indifference to his serious medical needs. Essentially, Dearmond claims that certain staff at the Federal Corrections Institute in Big Spring, Texas (FCI Big Spring) misdiagnosed his mental and behavioral problems when, in fact, he was suffering from a brain tumor. Dearmond claims that, due to the severity of his symptoms, it would have been apparent to even a layperson that he was in medical distress for almost a year. Subsequently, Dearmond did have surgery to remove a brain tumor and now brings this complaint. At the *Spears* hearing, the Court clarified Dearmond's already detailed complaint.[3]

Dearmond was transferred to FCI Big Spring on August 31, 2010. (Doc. 1, p. 5). Upon arrival, Dearmond was evaluated and found not to exhibit any psychological problems or odd behavior. (Doc. 1, p. 5). Sometime around January or February 2011, Dearmond claims that he began exhibiting symptoms and behaviors associated with a frontal lobe brain tumor. (Doc. 1, p. 5). Dearmond advises that these symptoms included incontinence, babbling, incoherence, wandering, falling, disorientation, poor hygiene, poor communication, poor memory, hallucinations, muscle spasms, and stuttering. (Doc. 1, p. 5). Dearmond reports that these uncharacteristic behaviors were brought to the attention of several FCI Big Spring staff members, but the first documented treatment by the medical unit (psychology department) was in April 2011. (Doc. 1, p. 5). During that encounter, Dearmond claims that Defendant Lefever, Ph.D., diagnosed him with malingering and instructed the staff to ignore his requests for assistance. (Doc. 1, p. 5).

---

[3] Dearmond's original, 47-page complaint specifically details each instance of the alleged deliberate indifference, but the Court will attempt to briefly summarize only a few of the allegations for the purposes of this order.

2

Dearmond reported that his mental and physical health deteriorated in the ensuing months, but that none of the staff rendered any medical assistance. (Doc. 1, p. 6). During this time, Dearmond claims that Defendant Rios stated, "I don't give a f**k if he dies!" (Doc. 1, p. 6) (alteration in original). Dearmond reports that several inmates informed Defendant Lefever about his rapid decline and poor condition, but to no avail. (Doc. 1, p. 6). Dearmond states that he received an incident report for wandering in an unauthorized area on August 11, 2018. (Doc. 1, p. 6). As a consequence, Dearmond reports that he was moved to the Special Housing Unit (SHU). (Doc. 1, p. 6). Dearmond relays that by this time his symptoms were so debilitating that it would have been clearly obvious to the layperson that he was in need of medical attention. (Doc. 1, p. 6). While in the SHU, Dearmond reports experiencing hallucinations, severe headaches, loss of appetite, and poor hygiene. (Doc. 1, p. 6). Dearmond advises that Defendants Gomez, Myers, and Tubb (SHU officers) witnessed his behavior but failed to render medical aid. (Doc. 1, p. 6).

On August 26, 2011, Dearmond was released from the SHU and taken to the Sunrise medical unit. (Doc. 1, p. 7). On September 26, 2011, Dearmond saw Defendant Estrella, a mid-level provider, who noted that Dearmond had poor hygiene, slow flat rate, incoherence, and impaired memory. (Doc. 1, p. 7). Dearmond claims that Defendant Estrella instructed him to return to the medical unit if his symptoms worsened. (Doc. 1, p. 7). Dearmond states that each time he returned to the medical unit, he was told to stop faking his symptoms and was sent away without any treatment or referral to a specialist. (Doc. 1, p. 7). Dearmond states on one occasion he left an examination with Defendant Estrella in a delirious state and was subsequently injured in a fall. (Doc. 1, p. 7). Dearmond states that he was unable to meet even his most basic needs and that he relied on other inmates to care for him since he had become unable to reason. (Doc.

3

1, p. 5-7). As a result of this impairment, Dearmond received several incident reports for wandering in unauthorized areas, failing to show up for night count, and failing to submit to a urinalysis test. (Doc. 1, p. 8). Dearmond was sent back to the SHU because of these incident reports. (Doc. 1, p. 8).

Dearmond advises that between September and December 2011, his symptoms began to worsen and officials did nothing to treat him. (Doc. 1, p. 8-11). In fact, Dearmond lodges very specific claims that he was severely mistreated and that his serious medical conditions were ignored. (Doc. 1, p. 8-11). Dearmond claims that while in the SHU, he fell off his bunk and was injured, but that the guards did not render aid. (Doc. 1, p. 9). Dearmond reports that on multiple occasions, he—upon inability to respond to the SHU officers' commands—was forcefully extracted from his cell, stripped down, and placed in four-point restraints and shackles for hours on end. (Doc. 1, p. 9). Dearmond contends that his inability to cooperate—viewed by Defendants as a refusal to cooperate—led to his loss of good time credits and commissary restrictions. (Doc. 1, p. 10).

On December 23, 2011, Dearmond claims that Defendant Lefever consulted with the regional psychology administrator who recommended that the medical unit rule out an underlying medical cause for his symptoms. (Doc. 1, p. 12). Thereafter, Defendant Partida diagnosed Dearmond's lab tests as normal. (Doc. 1, p. 12). However, on December 27, 2011, Dearmond reported that he was taken to the medical unit where Nurses Smith and Wilbourn recognized that something was "fatally wrong." (Doc. 1, p. 13). Dearmond states that these nurses initiated an informal examination and found him to be suffering from cerebritis or swelling of the brain. (Doc. 1, p. 13). As a result, Defendant Partida requested that Dearmond be transported to a local hospital. (Doc. 1, p. 13).

On December 28, 2011, a hospital physician ordered a scan of Dearmond's brain, which revealed a large cystic collection in the left frontal lobe. (Doc. 1, p. 13). Dearmond, suffering from respiratory failure secondary to encephalopathy and hypoxia, was intubated and airlifted to a hospital in San Angelo for emergency surgery. (Doc. 1, p. 13). On December 29, 2011, Dearmond underwent brain surgery to remove a 6.3 centimeter by 9 centimeter tumor. (Doc. 1, p. 13-14). Dearmond relays that the neurosurgeon informed him that if the surgery had been delayed even two days, he likely would have died. (Doc. 1, p. 14). Dearmond claims that his tumor had been growing for approximately one year. (Doc. 1, p. 15). Also, the surgeon informed Dearmond that, as a result of the surgery and the size of the tumor, he would likely suffer from lifelong cognitive challenges. (Doc. 1, p. 14). Dearmond reports that on January 5, 2012, he was placed back in the SHU to complete the sanctions from the prior incident reports. (Doc. 1, p. 15).

On January 10, 2012, Dearmond relays that he saw Defendant Alvarez due to back pain and burning, cloudy urination. (Doc. 1, p. 15). Dearmond states that Defendant Alvarez treated him for a urinary tract infection when in reality he had kidney stones. (Doc. 1, p. 15). Dearmond claims that this misdiagnosis caused pain in his abdomen, his skin to turn yellow, his stomach to bloat, and pain in his kidneys. (Doc. 1, p. 16). Dearmond claims that he begged SHU officers for medical help, but that they ignored his requests to be seen by the medical unit. (Doc. 1, p. 16). Dearmond avers that he was left to pass two kidney stones and a large amount of blood in his cell alone. (Doc. 1, p. 16). The next morning, Dearmond claims that medical personnel finally came to his cell, but by that time he could no longer stand or speak due to the extreme pain. (Doc. 1, p. 16). Dearmond declares that an examination confirmed that he had passed some kidney stones. (Doc. 1, p. 16). Dearmond states that he was administered medication to dissolve the remaining kidney stones. (Doc. 1, p. 16).

5

Dearmond states that he was released from the SHU on January 27, 2012, and placed back in general population. (Doc. 1, p. 17). While there, Dearmond claims that several other inmates recounted the abuses that he had suffered at the hands of FCI Big Spring staff. (Doc. 1, p. 17). Apparently Dearmond had previously been unaware of many of the alleged abuses. Dearmond states that FCI Big Spring officers overheard the inmates' statements and escorted him back to the SHU to "sort things out." (Doc. 1, p. 17).

Overall, Dearmond claims that he lost 41 days of good-time credit, two years of phone restrictions, loss of commissary privileges, months of disciplinary segregation, and loss of personal property stored in the SHU inventory room. (Doc. 1, p. 19). Dearmond also avers that his mail was intercepted; this evidenced through letters he sent out with no response. (Doc. 1, p. 19). Also, Dearmond complains that because he was on commissary restriction, he did not have access to stamps. (Doc. 1, p. 19). Essentially, Dearmond implies that his disciplinary restrictions, earned as a result of his erratic behavior due to a brain tumor, cut off his communication to the outside world. Additionally, Dearmond adds that Defendant Huff intercepted his written communications, possibly to prevent Dearmond from shedding light on the abuse he had suffered. (Doc. 1, p. 19).

Instead, Dearmond claims that Defendant Huff encouraged him to forget all of the incidents of mistreatment. (Doc. 1, p. 19). Dearmond stated that Defendant Huff tried to bargain with him, saying that all SHU charges would be dropped, the lost property would be remedied, and he would be transferred to a medical facility offering therapy if Dearmond just "forgot the whole thing." (Doc. 1, p. 20). Dearmond complains that none of his family was ever notified that he was suffering from any medical impairments or that he had undergone emergency brain surgery. (Doc. 1, p. 20).

6

Dearmond adds that on March 14, 2012, he was transferred to the Oklahoma City (OKC) transfer center. (Doc. 1, p. 20). The records sent to OKC did not mention Dearmond's brain tumor, surgery, or aftercare instructions. (Doc. 1, p. 20). Further, Dearmond claims that he is legally blind and that he was transferred to OKC without his eyeglasses. (Doc. 1, p. 20).

On March 21, 2012, Dearmond was transferred to FCI Bastrop. (Doc. 1, p. 21). Again, Dearmond complains that health services failed to transmit any records detailing his brain tumor, surgery, seizures, other health problems, aftercare instructions, or suicide attempts. (Doc. 1, p. 21). Also, Dearmond claims that was still without his eyeglasses. (Doc. 1, p. 21). Dearmond detailed injuries sustained as a result of being shackled for months, but claims that FCI Bastrop staff refused to provide any treatment. (Doc. 1, p. 21). On April 20, 2012, Dearmond claims that he was finally treated for the injuries caused by long term use of ankle and hand cuffs; these injuries consisted of open wounds that were draining puss. (Doc. 1, p. 21). Dearmond states that he was prescribed antibiotics and dry bandages for these injuries. (Doc. 1, p. 21).

On July 18, 2012, Dearmond was transferred to FCI Fort Worth because he required intensive medical supervision and therapy following his tumor resection. (Doc. 1, p. 22). Dearmond reports that he was still without his prescription eyeglasses. (Doc. 1, p. 22). On or about December 2012, Dearmond was diagnosed with borderline hypothyroidism, possibly a result of the chemicals administered during surgery and aftercare. (Doc. 1, p. 24). Dearmond claims that he was not receiving his prescribed occupational therapy as needed and that Defendants should have known that their failure to properly treat his serious medical condition would result in significant injury and the wanton infliction of pain. (Doc. 1, p. 24).

Dearmond claims that he still suffers from balance problems, stuttering, twitching, blocked vision, phantom odors, memory lapses, cognitive and social deficiencies, and several

physical ailments. (Doc. 1, p. 25). Dearmond relays that he will often lapse into a catatonic state while talking and cannot move. (Doc. 1, p. 25). Lastly, Dearmond claims continued difficulty with vocalization and recalling words. (Doc. 1, p. 25).

As a result, Dearmond claims that the Defendants violated his due process and Eighth Amendment rights to be free from cruel and unusual punishment. He seeks compensatory damages of $10,000,000; punitive damages of $10,000,000; and nominal damages. Also, Dearmond seeks damages for Defendants' negligent acts under the FTCA in the sum of $10,000,000. Finally, Dearmond requests a preliminary injunction requiring Defendants to provide occupational therapy to help improve his cognitive and motor skills.

## II.  Legal Standard

### A. Federal Tort Claims Act

It is well-settled that "[t]he [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976). Additionally, the United States is the only appropriate defendant in FTCA claims. *Galvin v. Occupational Safety & Health Admin.*, 860 F.2d 181, 183 (5th Cir. 1988) ("It is beyond dispute that the United States, and not the responsible agency or employee, is the proper party defendant in a[n] [FTCA] suit. . . . [T]he courts have consistently held that an agency or government employee cannot be sued *eo nomine* under the [FTCA]."); *Carr v. Veterans Admin.*, 522 F2d 1355, 1356 (5th Cir. 1975); *Esquivel-Solis v. United States*, 472 F. App'x 338, 339 (5th Cir. 2012) ("FTCA claims may be brought against only the United States, and not the agencies or employees of the United States.").

8

## B. Deliberate Indifference to Serious Medical Needs

A prison official may violate the Eighth Amendment if he is deliberately indifferent to an inmate's serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). However, allegations of negligent diagnoses or inadvertent failure to provide adequate medical care do not amount to deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In fact,

> . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Rather, to meet the extremely high standard in a deliberate indifference claim, the plaintiff must demonstrate that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This requires the inmate to allege that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). This standard does not require that government officials comply with "an optimal standard of care." *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 482 (5th Cir. 2014) (quoting *Easter v. Powell*, 467 F.3d 459, 463–64 (5th Cir. 2006)). Instead, officials are obligated "not to disregard any substantial health risk about which government officials are actually aware." *Kitchen*, 759 F.3d at 482. However, a

delay in medical care can rise to the level of a constitutional violation, but only if the deliberate indifference results in substantial harm. *Easter*, 467 F.3d at 463. Finally, "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir.1995).

### III. Analysis

After reviewing Dearmond's complaint, his testimony from the evidentiary hearing, and the administrative record, the Court finds that Dearmond's pleadings satisfy the *Domino* standard requiring an inmate to allege that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *See Domino*, 239 F.3d at 756. Further, Dearmond's complaints, if true, form "an arguable factual and legal basis, of constitutional dimension, for the asserted wrong[s]." *See Spears v. McCotter*, 766 F.2d at 181 (citation omitted).

Accordingly, on March 27, 2015, the Court ordered all named Defendants to be served with summonses and required to answer Dearmond's complaint. Only nine of the 39 summonses issued by the Court Clerk were executed. The unexecuted summonses were returned primarily due to insufficient information, however, several of them indicated that the named Defendant was no longer at the address or had retired. On August 3, 2015, the served Defendants (the United States of America, Javier Alvarez, D. Tubb, Eric Holder, M. Mauzey, Charles Samuels, M. Spencer, V. Tubbs, and Julia Woodward) filed their answers. This Court is of the opinion that service still needs to be effected on the remaining unserved Defendants and that each of them be required to answer Dearmond's complaint.

## IV. Conclusion

Accordingly, this Court **RECOMMENDS** that—upon transfer back to the District Court—that the Bureau of Prisons be ordered to provide the last-known addresses of the unserved Defendants under seal. Further, the Court **RECOMMENDS** that the District Court order answers from the remaining Defendants after service.

**IT IS ORDERED** that this case is **TRANSFERRED** back to the docket of the United States District Judge.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED.**

Dated October 9, 2015.

_____
E. SCOTT FROST
UNITED STATES MAGISTRATE JUDGE